UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MBC GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:26-cv-01517-JRO-TAB |
| | ) | |
| | ) | |
| WILLIAM MCCLAIN, | ) | |
| MARJORIE MCCLAIN, | ) | |
| ROBIN DAVIS, | ) | |
| HEATHER RODRIGUEZ GARCIA a/k/a | ) | |
| HEATHER HOEGEMAN, | ) | |
| CFA, INC. d/b/a CFA STAFFING, | ) | |
| CINTEMP, INC. d/b/a CTI PERSONNEL, | ) | |
| MAX CONSULTING, LLC, | ) | |
| COMFORT GUYS, INC., | ) | |
| RHONDARITA, INC., | ) | |
| LESLA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER DENYING EXTENSION OF TEMPORARY RESTRAINING ORDER**

Plaintiff, MBC Group, Inc. ("MBC Group"), alleges that Defendants William McClain and Majorie McClain (the "McClains"), their associates, Defendants Robin Davis, Heather Rodriguez Garcia, and entities in which the McClains have a substantial financial interest, Defendants CFA, Inc. d/b/a CFA Staffing; Cintemp, Inc. d/b/a CTI Personnel; Max Consulting, LLC; Comfort Guys, Inc.; RhondaRita, Inc.; and Lesla, Inc. (collectively "Defendants"), have taken $34,731,547.58 from MBC Group through a complex web of forged and fraudulent documents and hundreds of illegal financial transactions. *See generally* dkt. 23-1.

MBC Group asserts violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), against Defendants William McClain, Davis, and Garcia, and various state-law claims against these and the remaining Defendants. These state-law claims include, in relevant part, claims under the Indiana Corrupt Business Influence Act ("CBI"), commonly known as the Indiana RICO statute, Ind. Code § 35-45-6-2, Dkt. 23-1 ¶¶ 332–440; common law fraud, *id.* ¶¶ 447–454; and unjust enrichment, *id.* ¶¶ 472–478. The verified complaint seeks damages and fees as well as equitable and injunctive relief, including "a constructive trust and/or equitable lien imposed over the misappropriated funds and any and all assets purchased with them . . . ." *Id.* at 82.

Based on MBC Group's verified complaint and its satisfaction of the Rule 65 criteria, on July 29, 2026, the Court entered a "no notice" temporary restraining order ('TRO") that is set to expire today at 6:00 p.m. Dkt. 31. MBC Group now moves to extend the TRO until the Court's anticipated ruling on a forthcoming motion for preliminary injunction.

For the reasons stated below, the court **DENIES** Plaintiff's Motion for Extension of the TRO. Dkt. [53]. Because the TRO will expire at 6:00 p.m. on August 7, 2026, Defendants' Emergency Motion to Strike the Accounting Requirement from the Temporary Restraining Order, dkt. [48], is **DENIED** as moot.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The July 29, 2026, TRO did, essentially, three things: (1) imposed a freeze on funds and assets in the amount of $34,731,547.58 traceable to MBC Group (the "Disputed Funds"), with exceptions for the McClains' living expenses and the operations of Defendants' businesses (the "freeze"), (2) ordered a sworn accounting and disclosure statement from Defendants to identify the precise location of the Disputed Funds (the "accounting"), and (3) restricted Defendants' access to various operations, facets, and systems associated with MBC Group's business to ensure the separation of MBC Group and Defendants' affairs during the litigation (the "separation").  Dkts. 30, 31 & 35.  The TRO also ordered MBC Group to post a $1,000,000.00 bond.  It was set to expire after nine (9) days at 6:00 p.m. on August 7, 2026, "unless extended for good cause shown or with the consent of the party or persons restrained."  Dkt. 31 at  31–32.

The TRO was premised upon Plaintiff's showing of three principal facts reflected in the Verified Complaint and accompanying exhibits: (1) Defendants had been actively defrauding Plaintiff of millions of dollars.  Dkt. 30 at 8; *e.g.,* dkt. 23-1 ¶¶ 38–104.  (2) Defendants' wealth appeared largely generated by taking and dissipating MBC Group's own resources.  Dkt. 30 at 8; *e.g.,* dkt. 23-1 ¶ 88 (noting William McClain's "compensation from MBC Group skyrocketed from a nominal $45,000 in 2020 to an astronomical $10.225 million in 2021");  *id.* ¶ 90 ("In total, Defendants diverted more than $23 million from MBC Group directly into [William McClain's] pockets in less than two years.").  (3) Given that Defendants' wealth—especially the McClains'—appeared to come from MBC

Group's own resources, if Defendants no longer had access to MBC Group's funds, "it [was] reasonable to conclude that Defendants may become insolvent and unable to make MBC Group whole." Dkt. 30 at 8; *see also* dkt. 13 at 20 ("The threatened harm is the imminent dissipation, concealment, and irreversible transfer of assets beyond the reach of any judgment—harm no later damages award could remedy."). Based on these facts, the Court concluded that Plaintiff faced irreparable harm without the TRO's freeze, accounting, and separation, and that a balance of harms favored MBC Group over the Defendants. Dkt. 30 at 8–9.

On August 3, 2026, Defendants filed an emergency motion to modify the sworn accounting requirement of the TRO based on the parties' agreement. Dkt. 48. The Court granted that motion and suspended the accounting requirement pending further proceedings. Dkt. 49. On August 5, the parties submitted additional briefings outlining their arguments for or against the extension or modification of the TRO. At an August 6 hearing, the parties presented their arguments. During the hearing, Defendants proffered evidence of Defendants' solvency and alternative revenue streams outside of MBC Group, *see also* dkts. 58, 59, and of the harms the TRO would cause to Defendants' (and MBC Group's) business operations if extended without substantial modification, *see also* dkt. 61. The Court **DENIED** Defendants' motion to immediately dissolve the TRO but took the issue of extending the TRO past its expiration under advisement. Dkt. 57 at 1.

## II. LEGAL STANDARD

A TRO, like any form of preliminary injunctive relief, "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The Court may grant or extend a temporary restraining order upon Plaintiff showing (1) some likelihood of succeeding on the merits, (2) irreparable harm for which there is no adequate remedy at law, (3) the balance of harms favors the Plaintiff, and (4) that the order is in the public interest. *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992)); *see Barker v. Reagle*, No. 1:23-cv-00994-JMS-TAB, 2023 WL 3918964, at *2 (S.D. Ind. June 9, 2023) ("Courts generally apply the same equitable standards to a motion for a temporary restraining order as they do to a motion for a preliminary injunction."). Damages are normally an adequate remedy at law for the theft of identifiable money. *Fuelmaster of Am. LLC v. Quick Fuel Transp., Inc.*, No. 1:23-cv-02285-JPH-MJD, 2023 WL 12306222, at *3 (S.D. Ind. Dec. 23, 2023). A temporary restraining order issued under Rule 65 expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. Fed. R. Civ. P. 65(b)(2).

## III. DISCUSSION

MBC Group's motion to extend the TRO rests upon the same facts the Court relied upon to order the TRO in the first place. But now Defendants have presented a different side of the story. Based on their proffered evidence, assurances at the TRO hearing, and additional evidence filed after the hearing

on August 6, the Court concludes that it lacks a factual basis to find a likelihood of irreparable harm at this time and that the balance of harms does not decisively favor MBC Group.   While the parties also dispute the likelihood of Plaintiff's success on the merits, the Court need not consider this factor beyond what it has already said, dkt. 30 at 6–7, to deny Plaintiff's motion to extend the TRO.

## A.   Irreparable Harm

"Irreparable harm occurs when the legal remedies available to the movant are inadequate, meaning they are seriously deficient as compared to the harm suffered." *Wisconsinites for Alternatives to Smoking & Tobacco, Inc. v. Casey*, 172 F.4th 976, 990 (7th Cir. 2026) (cleaned up); *Neal v. Operators of Digital Props. Set Forth in Exhibit 1*, No. 2:24-cv-263-GSL-AZ, 2024 WL 5055078, at *2 (N.D. Ind. Dec. 9, 2024) (noting "the elements of irreparable harm and the availability of an adequate remedy at law are separate and distinct. The *only* time where the two elements are appropriately viewed as one is when damages are the sole relief requested at trial" and citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)).   "Quantifiable harm is typically not irreparable." *Casey*, 172 F.4th at 990 (citing *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021)).   Based on the changed circumstances that have occurred since the Court issued its TRO and Defendants' proffered evidence, Plaintiff cannot show irreparable harm at this time.

First, since the Court's order, the parties confirm they are actively engaged in the tedious process of separating MBC Group from Defendants' day-to-day activities.   Defendants confirmed at the hearing that they do not oppose this

6

separation and will continue this process voluntarily, given that this lawsuit has fundamentally ruptured the working relationship of MBC Group and the Defendants. *See also* dkt. 52 at 6. Based on this representation, no irreparable harm will result from allowing the TRO's separation order to expire because the separation is already occurring.

Second, with the benefit of additional evidence, the Court is not persuaded that MBC Group is unlikely to be made whole if it prevails in this lawsuit. In issuing the TRO—and the freeze and accounting in particular—the Court relied upon *Roland*, 749 F.2d at 386. This case addressed the factors for issuing preliminary injunctive relief and described circumstances in which a damages remedy may be inadequate to make a plaintiff whole if it prevails on the merits. These scenarios include a plaintiff "becom[ing] insolvent before a final judgment can be entered and collected." *Id.*; *accord Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940) (noting that upon "allegations that [defendant] was insolvent and its assets in danger of dissipation or depletion . . . the legal remedy against [defendant] . . . would be inadequate"); *see also* dkt. 30 at 8. That scenario had support in Plaintiff's evidence given the extent and scale of the alleged fraud and the verified complaint's description of how Defendants, and the McClains in particular, were using the Disputed Funds.

Now, Defendants have confirmed that they "are prepared to demonstrate solvency if necessary through financial disclosures." Dkt. 52 at 6. The McClains made good on this offer by filing declarations about their personal finances supporting this fact. Dkts. 58, 59. At the TRO hearing, counsel for Defendants

also proffered that the Defendants' business entities raise substantial revenues and generate profit independently of MBC Group's revenues and funds. This proffer combined with the McClains' declarations largely eliminate the Court's concerns about solvency or Defendants' inability to satisfy a judgment at a later date. Based on this evidence, the Court concludes that it is far more likely that Defendants will be able to make MBC Group whole at the conclusion of this litigation if Plaintiff prevails on its claims. This extinguishes Plaintiff's primary argument for freezing Defendants' funds and any accounting necessary to trace those funds to discrete accounts or property.

MBC Group argues that it still faces irreparable harm despite Defendants' assurances of separating from MBC Group's affairs and generating wealth through independent sources. At the TRO hearing, it argued essentially the same point it made in its brief in support of the TRO, namely that MBC Group has a right to seek the equitable remedy of a constructive trust, which is based on an equitable interest in an identifiable, traceable "res" in the form of Defendants' accounts and identifiable property. *Hall v. Ind. Dep't of State Revenue*, 351 N.E.2d 35, 39 (Ind. Ct. App. 1976). MBC Group argues that without a TRO, Defendants will continue to commingle Disputed Funds with their other funds and assets and that "[e]ach further round of mixing, spending, and transferring erodes Plaintiff's ability to trace its property, and if it continues, it will erase the financial trail and render a final equitable accounting impossible." Dkt. 13 at 24; *see also* dkt. 53 at 4–5. In other words, to preserve the ability to seek a constructive trust that includes the entire $34 million in

Disputed Funds at the end of this case, Plaintiff contends the Court must preserve that trust intact by freezing Defendants' accounts and ordering an accounting.

The potential for MBC Group to miss out on its preferred equitable remedy—in this case, a constructive trust—does not mean that it will suffer irreparable harm. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("It is a basic doctrine of equity jurisprudence that courts of equity should not act when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." (cleaned up)); *see also Casey*, 172 F.4th at 990 ("Quantifiable harm is typically not irreparable.").

This lawsuit as it currently stands is not about recovery of a unique, irreplaceable res—like a home or custom automobile—or other forms of loss that are difficult to quantify—like unique customers, reputation, or goodwill.  The Seventh Circuit has summarized the kinds of losses that are irreparable, and the Court is not aware of any case that suggests that money is one of them.  *E.g.*, *Life Spine, Inc.*, 8 F.4th at 546 (holding that inability to identify lost business and lost customer contracts are the kind of unidentifiable losses that support a showing of irreparable harm); *see also* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed. 2002 & April 2021 Supp.) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable.").

Plaintiff seeks recovery of money.  Quantifying, tracing, and accounting for the Disputed Funds and identifying them in specific accounts is certainly one

method of ensuring MBC Group will be made whole at the end of the litigation. But it is not the only method.  If Plaintiff can recover the entire sum of the Disputed Funds and any punitive damages and fees at the end of this lawsuit, then its only argument for irreparable harm vanishes.[1]  Based on Defendants' evidence and proffer confirming solvency and ongoing, independent revenue streams, tracing and accounting for the Disputed Funds is not essential to avoiding irreparable harm.[2]

This is why the Court did not credit Plaintiff's preferred remedy argument when it issued its July 29 Order.  *See* dkt. 30 at 8.  Instead, the Court relied upon the inadequacy scenario described in *Roland* of a defendant's insufficient revenue streams or insolvency.  Again, those scenarios had support in Plaintiff's

---

[1] Irreparable harm and the inadequately of a remedy at law are two separate factors for seeking preliminary injunctive relief.  *Neal*, 2024 WL 5055078, at *2.  MBC Group's argument for irreparable harm largely conflates the two.  This is understandable given that the equitable remedy MBC Group seeks looks almost indistinguishable from a remedy at law.  Whether MBC Group seeks to recover the Disputed Funds through a constructive trust or as money damages, it is seeking a recovery of money.  And as explained above, MBC Group cannot show at this time that Defendants are unable to pay back this money if MBC Group prevails at the end of the litigation.  In this way, it makes sense to say MBC Group cannot show irreparable harm because it has an adequate remedy at law, even though this effectively melds the two factors.

[2] To be clear, tracing and accounting for the Disputed Funds remains essential to establishing a constructive trust in the Disputed Funds.  This form of equitable relief remains part of Plaintiff's case and may be fully pursued in discovery and presented to the Court for judgment at the appropriate time.  But the Court is not persuaded at this time that the notion of Rule 65 irreparable harm encompasses a party's concerns that a defendant will thwart its ability to develop facts in discovery to support an equitable remedy.  If MBC Group has concerns that Defendants' will destroy evidence in bad faith, these concerns are best left to the traditional tools of discovery sanctions.  And MBC Group's motion to preserve evidence, dkt. 10, has been granted, dkt. 64.  If MBC Group has concerns with Defendants' dissipation of funds and assets, the evidence on that front is simply insufficient at this time to warrant Rule 65 relief given Defendants' proffer of evidence.  MBC Group is free to put this proffer to the test at a preliminary injunction hearing.

evidence.   But given Defendants' proffer of alternative revenue streams and solvency, the Court can no longer conclude (at least at this time) that a damages remedy will be inadequate.  If Plaintiff has a basis in fact to challenge Defendants' proffer and show that tracing and recouping all of Defendant's ill-gotten gains is the only way to be made whole, it may pursue that issue in discovery and present its case in a motion for preliminary or permanent injunctive relief at a later date.

MBC Group also argued at the hearing that the Court should unsuspend its order requiring an accounting and extend that order because Defendants confirm that they are willing and ready to do that task.  *See also* dkt. 53 at 6–8; dkt. 55 at 2.  But Defendants expressed this willingness only as part of the discovery process, not pursuant to a TRO.  *See also* dkt. 52 at 3; dkt. 58 at 6. More fundamentally, without a showing of irreparable harm at this stage of the litigation, MBC Group is not entitled to this relief under Rule 65 in any case.

## B.    Balance of Harms

Even if MBC Group made a showing of irreparable harm, the Court must still "weigh[] the harm of denying an injunction to the plaintiff against the harm to the defendant of granting one." *Life Spine, Inc.*, 8 F.4th at 539.

At the August 6 hearing and in subsequent briefing, dkt. 61, Defendants proffered that extending the TRO in its current form creates logistical and financial problems for funding the routine payroll and operations of Defendants CFA, Inc. d/b/a CFA Staffing ("CFA") and Cintemp, Inc. d/b/a CTI Personnel ("CTI").  These entities work with at least one non-party bank, Webster Bank, N.A., to fund the payroll.  Defendants describe this arrangement as follows:

11

- Webster Bank advances funds directly to the respective temporary employees on behalf of CFA and CTI to make the payroll of those temporary employees who are respectively employed by CFA and CTI and to work at the respective clients of CFA and CTI.

- The companies which are the respective customers of CFA and CTI which receive the labor from the temporary employees, are respectively invoiced by CFA and CTI and then those customers pay their respective invoices into a separate lock box for each of CFA and CTI (as the case may be) at Webster Bank.

- Webster Bank then deducts from those monies collected in the lockbox the amounts owed to Webster Bank for the advances made to meet the payroll, plus interest and any fees, for its services and any reserves, and then it normally remits the remaining balance respectively due to CFA's and CTI's respective bank accounts.

Dkt. 61 at 3. Defendants further proffer that Webster Bank "hold[s] security interests in the assets of each of CFA and CTI" and that "Mr. McClain, Mrs. McClain, and Mr. Holloway [MBC Group's president] all signed personal guarantees in favor of Webster Bank for MBC's obligations to Webster Bank." This implies that any freeze on the McClains' funds could jeopardize Webster Bank's confidence in the McClains' personal guarantees. Moreover, Mr. Holloway's personal guarantee suggests that MBC Group's own financial position is connected in some way to Defendants' financial positions.

Defendants acknowledge that the Court's TRO left room for Defendants to draw upon the Disputed Funds to pay for ordinary business operations, and later modified the TRO to remove any limit to the amount of funds that the

12

corporate Defendants might need.  *See* dkt. 35.  But Defendants argue that this modification did not address the impact of an ongoing freeze on the McClains' personal guarantees to Webster Bank.  Plaintiff presented no evidence to contradict or undermine this proffer other than to suggest that a more tailored TRO could account for these complexities.  *See also* dkt. 72.

The Court need not credit every detail of Defendants' proffer at this stage to reasonably conclude that the business operations of MBC Group and several of the Defendants are complex, interconnected, and dependent upon Webster Bank's trust in their collective financial stability.  Without substantially more evidence, the Court is no longer confident that it can craft preliminary injunctive relief that prevents unintended, and potentially irreparable, collateral consequences.

Finally, given Defendants' proffer, the Court now has concerns that ordering a freeze of assets does not actually maintain the status quo—the general purpose of a TRO—but would disrupt it.  In other words, MBC Group may be seeking mandatory preliminary relief that requires affirmative disruption to the parties' legitimate business operations, even if it also preliminarily enjoins alleged fraudulent conduct.  *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) ("Mandatory preliminary injunctions—those 'requiring an affirmative act by the defendant'—are 'ordinarily cautiously viewed and sparingly issued.'").  That is not necessarily fatal to preliminary injunctive relief, but it requires a "more searching" analysis and increases the burden MBC Group faces in convincing the Court that it is justified at this stage of the litigation.  *See id.*

In sum, Defendants face some risk of harm by the Court extending the TRO. The balance of harms does not decisively favor MBC Group.

* * *

Because MBC Group has not carried its burden to show good cause for extending the TRO on both the issues of irreparable harm and balance of the harms, the Court will not extend the TRO.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion for Extension of the TRO, dkt. [53], and **DENIES** as moot Defendants' Motion to Strike the Accounting Requirement from the Temporary Restraining Order, dkt. [48]. Pursuant to the Court's previous order, dkt. 57 at 2, any motion for preliminary injunction shall be filed **no later than Thursday, October 8, 2026**. The Temporary Restraining order **shall expire** at 6:00 p.m. Friday, August 7, 2026. Dkt. 31 at 31–32, 33.

**SO ORDERED**.

Date: 8/7/2026

_____

Justin R. Olson
United States District Judge
Southern District of Indiana

Distribution:

All ECF-Registered counsel of record via email

14